**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Samuel John PASSARELLA,**
**Defendant-Appellant.**

No. 85–5375.

United States Court of Appeals,
Sixth Circuit.

Argued Jan. 20, 1986.

Decided April 17, 1986.

Donald E. Dawson, Asst. Federal Public Defender, Nashville, Tenn., James K. McCrarey (argued), for defendant-appellant.

Joe B. Brown, U.S. Atty., Nashville, Tenn., Michael Spalding (argued), for plaintiff-appellee.

Before ENGEL, KENNEDY and RYAN, Circuit Judges.

ENGEL, Circuit Judge.

Defendant Samuel J. Passarella appeals his convictions of five counts of an indictment charging him with conspiracy to sell or exchange counterfeit obligations of the United States in violation of 18 U.S.C. §§ 472 and 473, the unlawful possession and transfer of Federal Reserve notes in violation of 18 U.S.C. §§ 472 and 473, conspiracy to distribute Schedule II controlled substances in violation of 21 U.S.C. § 841(a)(1), and the use of a communication facility in the distribution of cocaine in violation of 21 U.S.C. § 843(b). On appeal, Passarella raises three grounds for reversal of some or all of his convictions. First, Passarella argues that the district court improperly admitted evidence gained by the government's unlawful interception of his telephone calls; second, Passarella argues that the district court improperly admitted irrelevant and prejudicial evidence thereby depriving him of his right to a fair trial; and third, he contends the evidence was insufficient to support his convictions. We affirm.

On June 19, 1980, a grand jury of the United States District Court for the Middle District of Tennessee returned the five-count indictment charging Passarella with violations of federal law. The case was tried on December 1 and 2, 1980, before United States District Judge John Nixon, Passarella having waived his right to a jury trial. After the completion of the government's case, the defense rested without introducing any evidence. Thereafter, Judge Nixon found Passarella guilty of all five counts. No appeal was taken but Passarella subsequently filed a petition for writ of habeas corpus under 28 U.S.C. § 2255 alleging that he was denied effective assistance of counsel by reason of his counsel's failure to perfect his right of appeal. Judge Nixon vacated the original sentence and resentenced Passarella on April 24, 1985, to fifteen years each on counts one through four, and four years on count five, all counts to run concurrently. This appeal followed.[1]

Of the contentions raised by Passarella in his appeal, only one merits detailed discussion. To effect Passarella's arrest, the arresting officers, armed with a valid arrest warrant, gained admission to his home and ascertained from others in the house that he was expected to return shortly. While upon the premises, the telephone in Passarella's home rang. One of the officers, special agent Moulton, answered the phone and took the messages intended for Passarella. In two calls, Moulton permitted the caller to assume that he was Passarella himself, although the officer did not expressly so state. During the course of these calls, the caller, believing that Moulton was Passarella, talked about an opportunity for a major sale of dilaudids. This incriminating evidence was subsequently used against Passarella at his trial.

1. The record and docket entries of the district court reflect a clerical error, both in the Judgment Order of April 24, 1985, and in the docket entry thereto. According to these documents, after Passarella's original sentence was vacated as a result of his action brought under 28 U.S.C. § 2255, Passarella entered a counseled plea of guilty to each of the five counts charged in the original indictment. If true, this would seriously impede Passarella in his ability in this appeal to go behind that plea to challenge alleged errors in his trial since any such errors would be rendered moot by a plea. Both the government's and the defendant's counsel agree, however, that the records is in error in this respect and we proceed therefore to consider all issues raised on their merits.

No challenge is made to the validity of the arrest warrant or as to the right of the officers to be in Passarella's home for the purpose of executing the warrant. Passarella does claim, however, that in answering the telephone in the manner indicated and in thus intercepting the messages, the government agent exceeded the permissible scope of any search incident to Passarella's arrest and was guilty of violating his right of privacy under Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–2520, and the Fourth Amendment to the United States Constitution.

Passarella's reliance upon Title III is without merit. It is generally true that "to protect effectively the privacy of wire and oral communications ..."[2] Congress provided that evidence acquired by law enforcement officers through the interception of wire or oral communications is inadmissible unless the officers obtained prior judicial authorization for the interception. *See* 18 U.S.C. §§ 2515–2518. These procedural and substantive provisions, however, were made expressly inapplicable to consensual interceptions, such as those in the instant case. Thus, 18 U.S.C. § 2511(2)(c) provides:

It shall not be unlawful under this chapter for a person acting under color of the law to intercept a wire or oral communication, where such person is a party to the communication or one of the parties to the communication has given prior consent to the interception.

■ In the instant case, because special agent Moulton directly answered the ringing telephone calls while lawfully on Passarella's premises, he was "acting under color of the law" and he was "a party to the communication." Moulton's conduct in this respect was therefore not in violation of Title III. This conclusion finds ample support in both the legislative history of section 2511(2)(c)[3] and the case law interpreting this provision. *See, e.g., United States v. Vadino,* 680 F.2d 1329, 1335 (11th

Cir.1982); *United States v. Campagnuolo,* 592 F.2d 852, 862–63 (5th Cir.1979); *United States v. Kane,* 450 F.2d 77, 84–85 (5th Cir.1971), *cert. denied,* 405 U.S. 934, 92 S.Ct. 954, 30 L.Ed.2d 810 (1972). While this conclusion disposes of Passarella's statutory claim, there remains the question of whether Passarella's right to be free from "unreasonable searches and seizures" was violated when Moulton answered the ringing telephone while endeavoring to execute an arrest warrant at Passarella's home.

■ We emphasize that Passarella does not contest the validity of the arrest warrant, nor does he contend that the agents overextended their stay while executing that warrant. There is no question, therefore, but that agent Moulton was lawfully on the premises at the time he answered the telephone calls. Nevertheless, Passarella argues that because the agents were not armed with a search warrant, Moulton violated Passarella's "legitimate expectation of privacy regarding calls to him on his home phone when the caller asked to speak to 'Sam.'" Although this question is not without difficulty, we conclude that where the officers were lawfully upon the premises and answered the telephone, no expectation of privacy arose as to those conversations in which Passarella did not participate.

That the Fourth Amendment protects a person's legitimate expectations of privacy has been established at least since *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). Based on this notion, the Supreme Court held that "[t]he Government's activities in electronically listening to and recording the petitioner's words violated the privacy upon which he justifiably relied while using the telephone booth and thus constituted a 'search and seizure' within the meaning of the Fourth Amendment." *Id.* at 353, 88 S.Ct. at 512. In reaching this conclusion, however, the court emphasized that it was the *petition-*

---

2. Pub.L. No. 90–351, § 801(b), 82 Stat. 197 (1968).

3. S.Rep. No. 1097, 90th Cong. 2d Sess., *reprinted in* 1968 U.S. Code Cong. & Ad. News 2112, 2182.

*er's*, i.e., *Katz's*, conversational privacy that was entitled to protection: "One who occupies [a telephone booth], shuts the door behind him, and pays the toll that permits him to place a call is surely entitled to assume that the *words he utters* into the mouthpiece will not be broadcast to the world." *Id.* at 352, 88 S.Ct. at 511–12. (emphasis added).

Properly understood, therefore, *Katz* protects a person's own conversational privacy from unjustifiable governmental intrusions. Certainly one cannot claim an expectation of privacy in the words uttered by another. Here, however, and unlike *Katz*, there was no intrusion upon Passarella's conversational privacy; Passarella simply was not a participant in any of the telephone conversations. The only participants in these conversations were agent Moulton and the caller. It is clear, moreover, that because "[a] conversation belongs equally to all participants ... no one can have an expectation of privacy about the use of a conversation by a participant." *United States v. Baldwin*, 632 F.2d 1, 3 (6th Cir.1980) (Jones, J., dissenting from denial of petition for rehearing).

Passarella's brief suggests, however, that because agent Moulton did not identify himself, the agent was therefore not a legitimate participant in those telephone conversations intended for someone else. We disagree. Initially, we note that agent Moulton did not make any affirmative misrepresentations, but merely permitted the caller to assume that he was Passarella. In addition, we note that the Supreme Court has always sanctioned a certain degree of deception or subterfuge on the part of law enforcement authorities as a necessary incident to the investigation of unlawful activities, which are, by their nature, covert and secretive. *See Lewis v. United States*, 385 U.S. 206, 87 S.Ct. 424, 17 L.Ed.2d 312 (1966); *On Lee v. United States*, 343 U.S. 747, 72 S.Ct. 967, 96 L.Ed. 1270 (1952); *United States v. Guidry*, 534 F.2d 1220 (6th Cir.1976); *see also* 2 W. LaFave, *Search and Seizure* 677–83 (1978). What we said in *United States v. Leja*, 568 F.2d 493 (6th Cir.1977), is also relevant

here. There, we "recognize[d] that the realities involved in curbing drug abuse require aggressive methods of enforcement, justifying conduct which in gentler circumstances might indeed be distasteful." *Id.* at 498. *See also United States v. Russell*, 411 U.S. 423, 432, 93 S.Ct. 1637, 1643, 36 L.Ed.2d 366 (1973).

■ In short, we do not believe that Moulton's failure to identify himself in any way vitiated the legality of his conduct under the circumstances of this case. Certainly, if the caller had been in Passarella's home and had spoken directly to Moulton or in his presence in the belief that Moulton was Passarella or an accomplice, Passarella would have no cause to complain. *Cf. United States v. White*, 401 U.S. 745, 91 S.Ct. 1122, 28 L.Ed.2d 453 (1971); *Hoffa v. United States*, 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966). For constitutional purposes, it makes little difference whether agent Moulton did or did not identify himself when he answered Passarella's telephone calls. In neither case can Passarella claim an expectation of privacy because in both cases the conversation is knowingly carried on in the agent's presence. That the caller is unaware of the agent's true identity is irrelevant. The Fourth Amendment does not protect a wrongdoer's misplaced trust, *Hoffa*, 385 U.S. at 302, 87 S.Ct. at 413, nor does it require the police to offer their true identity whenever they answer the telephone.

Every federal and state court which has addressed facts similar to those here has also concluded that an agent's conduct in answering a telephone while lawfully on the premises is not violative of the Fourth Amendment. *See United States v. Vadino*, 680 F.2d 1329 (11th Cir.1982); *United States v. Gallo*, 659 F.2d 110 (9th Cir.1981); *United States v. Kane*, 450 F.2d 77 (5th Cir.1971); *United States v. Fuller*, 441 F.2d 755 (4th Cir.), *cert. denied*, 404 U.S. 830, 92 S.Ct. 74, 30 L.Ed.2d 59 (1971); *Flaherty v. Arkansas*, 255 Ark. 187, 500 S.W.2d 87 (1973), *cert. denied*, 425 U.S. 995, 94 S.Ct. 1599, 39 L.Ed.2d 893 (1974);

*McNulty v. Colorado*, 174 Colo. 494, 483 P.2d 946 (1971); *California v. Warner*, 270 Cal.App.2d 900, 76 Cal.Rptr. 160 (1969); *Riley v. Delaware*, 249 A.2d 863 (Del.), *cert. denied*, 395 U.S. 947, 89 S.Ct. 2016, 23 L.Ed.2d 465 (1969). Passarella insists, however, that these cases cannot be controlling because they involved lawful entry while executing a search warrant and rested, at least in part, on a finding that interception of the incoming calls was an appropriate and integral part of the authorized search of the premises.

Some of these cases, it is true, can be read in this fashion. *See, e.g., Gallo*, 659 F.2d at 114; *Kane*, 450 F.2d at 85; *Fuller*, 441 F.2d at 760. We believe, however, that a search warrant to search another's premises simply provides a sufficient and not a necessary condition to answer a telephone while lawfully present to search those premises. As the Supreme Court explained in *Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980):

> It is true that the area that may legally be searched is broader when executing a search warrant than when executing an arrest warrant in the home. *See Chimel v. California*, 395 U.S. 752 [89 S.Ct. 2034, 23 L.Ed.2d 685 (1969)]. This difference may be more theoretical than real, however, because the police may need to check the entire premises for safety reasons, and sometimes they ignore the restrictions on searches incident to arrest.
>
> But the critical point is that any differences in the intrusiveness of entries to search and entries to arrest are merely ones of degree rather than kind. The two intrusions share this fundamental characteristic: the breach of the entrance to the individual's home.

*Id.* at 589, 100 S.Ct. at 1381. In our view, in the circumstances obtaining here, it makes little difference whether the police are armed with a warrant to search the defendant's premises or whether the police are armed with a warrant to arrest the defendant. In both instances, the police are authorized to enter the defendant's premises in order to search for and seize that which is described in the warrant; and once lawfully present, the police may answer a ringing telephone.[4]

In sum, we believe that Title III establishes the necessary procedures to protect an individual's oral and wire communications, including telephone calls, from unjustified governmental invasions. *See* 18 U.S.C. §§ 2510–2518. Title III is expressly intended to conform to the constitutional standards delineated in *Katz v. United States, supra*, and *Berger v. New York*, 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040

**4.** It is only if one assumes that answering a telephone while lawfully on the premises is itself entitled to constitutional protection does the difference between an arrest warrant and a search warrant become constitutionally significant. Even if we were to assume that an individual's incoming phone calls are entitled to constitutional protection, it would not follow that answering those calls while executing an arrest warrant would be violative of the Fourth Amendment. It is clear that if the police are lawfully within the premises to make an arrest, they may conduct a search of those premises to the extent necessary to locate the individual to be arrested. *See Warden v. Hayden*, 387 U.S. 294, 298–99, 87 S.Ct. 1642, 1645–46, 18 L.Ed.2d 782 (1967); *United States v. Woods*, 560 F.2d 660, 665–66 (5th Cir.1977); *United States v. Dudley*, 352 F.Supp. 1140, 1142 (E.D.Mich.1972). As one court explained: "While the ultimate objective of an arrest entry is an arrest, the arrest can only be effected if the subject is first found and thus a search is a necessary factual prerequisite to the possible arrest." *United States v. Cravero*, 545 F.2d 406, 416 (5th Cir.1976). *See also Payton*, 445 U.S. at 589, 100 S.Ct. at 1381.

In the instant case, agent Moulton answered Passarella's telephone while executing an arrest warrant for his arrest and at a time when Passarella had not yet been located. In addition, the agents were told by others within the premises that Passarella was expected to return shortly. Agent Moulton also testified that he answered the telephone in the belief that doing so might help him learn of Passarella's whereabouts. Thus, even if we were to assume that answering the telephone of another is entitled to constitutional protection, we could very well conclude that the agent's conduct under the circumstances of this case was limited to the extent necessary to locate Passarella and therefore "reasonable" within the meaning of Fourth Amendment jurisprudence.

(1967).[5] And, that statute specifically exempts from its substantive and procedural provisions the interception of telephone calls by one "acting under color of law ... where such person is a party to the communication." 18 U.S.C. § 2511(2)(c). We conclude, therefore, that where the officers were lawfully upon the premises and answered the telephone, any incriminating evidence acquired from those telephone calls is not subject to suppression on grounds of constitutionally protected privacy concerns.

We also reject Passarella's argument that the trial court improperly admitted irrelevant and prejudicial testimony thereby depriving him of a fair trial. Here, Passarella challenges the government's introduction of testimony concerning the seizure of drugs and conterfeit currency from a U-Haul trailer in the possession of Monty Hudson. Passarella also argues that the government's witnesses were improperly permitted to testify about crimes involving drugs and counterfeit currency which were not shown to have been related to Passarella. According to Passarella, the contraband that was seized from the U-Haul trailer and the evidence of crimes committed by others was irrelevant and prejudicial because there was no showing that this evidence was connected to Passarella. We disagree.

"Relevant evidence" is any evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence." Fed.R.Evid. 401. In light of this standard, we are convinced that the challenged evidence was relevant to the background, development, and existence of the conspiracy, a crime which was charged in the indictment and of which Passarella was convicted. Count one of the indictment charged Passarella with conspiring to buy, sell, exchange, receive, and deliver counterfeit obligations of the United States in violation of 18 U.S.C. §§ 472 and 473. In

furtherance of the conspiracy, the indictment alleged that Monty Hudson traded counterfeit obligations to Passarella for pharmaceutical drugs, and that Hugh White and Jimmy Hamm obtained counterfeit obligations from Passarella in exchange for genuine currency. Count four of the indictment charged Passarella with conspiring to distribute Schedule II controlled substances, including demerol, codeine sulfate, dilaudid, morphine, and cocaine, in violation of 21 U.S.C. § 841(a)(1). In furtherance of the conspiracy, the indictment alleged that Passarella and Monty Hudson agreed to, and did, exchange the Schedule II substances for counterfeit obligations.

■ The evidence of drugs and counterfeit obligations seized from Monty Hudson's U-Haul trailer was relevant to the existence of the conspiracy charged in the indictment as well as Passarella's participation in that conspiracy. Cf. United States v. Robinson, 763 F.2d 778, 783 n.8 (6th Cir.1985); United States v. Rohrer, 708 F.2d 429, 434–35 (9th Cir.1983). There was evidence that the serial numbers on the counterfeit currency seized from the U-Haul trailer matched the serial numbers on the counterfeit currency associated with Hugh White, Jimmy Hamm, and Passarella. The evidence seized from the U-Haul trailer was therefore admissible as being relevant to any common contraband activity which the evidence showed to have involved Passarella, Hudson, and others. In addition, this evidence was admissible to corroborate the testimony of Don Parsons, a former confederate of Passarella's who testified on behalf of the government about the drug-related and counterfeit activities of Passarella, Hudson, White, and Hamm.

■ For similar reasons, we believe that the testimony concerning crimes committed by others was properly admitted over Passarella's objection. Specifically, Passarella objected to the testimony of Don Parsons and Hugh White concerning their admitted

---

**5.** S.Rep.No. 1097, 90th Cong., 2d Sess. 70, reprinted in 1968 U.S. Code Cong. & Ad. News 2112, 2113.

activities in passing counterfeit currency in Oklahoma, Texas, and Arkansas. Although Passarella was not shown to have specifically participated in these particular criminal activities, our review of the record convinces us that this evidence was relevant to the background and the nature of the conspiracy charged in the indictment. Thus, Parsons testified that just before coming to live with Passarella, he had been arrested in Arkansas on forgery charges. He further testified that sometime thereafter Hugh White was arrested in Oklahoma for passing counterfeit currency. Hugh White likewise testified about his arrest in Oklahoma for passing counterfeit currency and also about how he later conferred with Passarella concerning the counterfeiting charges. Plainly, this evidence was probative of both an ongoing relationship between the coconspirators and Passarella's "knowledgeable participation" in the conspiracy. *See United States v. Marvin,* 687 F.2d 1221, 1228 (8th Cir.1982), *cert. denied,* 460 U.S. 1081, 103 S.Ct. 1768, 76 L.Ed.2d 342 (1983).

Passarella also argues that the district court impermissibly allowed Parsons to testify about other criminal acts committed by Passarella which were not to set out in the indictment. For example, Parsons testified about drug deals between himself and Passarella, as well as Passarella and Hudson.[6] According to Passarella, either this evidence was irrelevant and therefore inadmissible or, to the extent that it was relevant, it was more prejudicial than probative and therefore should not have been admitted in any event. Again, we disagree.

In *United States v. Ismail,* 756 F.2d 1253 (6th Cir.1985), we outlined the circumstances under which prior acts evidence may be admissible in a case such as this. There, we explained:

> The law is clear, of course, that evidence of past criminal activity is inadmissible to show criminal propensity. *See, e.g., United States v. Davis,* 707 F.2d 880, 884

(6th Cir.1983); *United States v. Reed,* 647 F.2d 678, 686 (6th Cir.), *cert. denied sub nom. Lawson v. United States,* 454 U.S. 1037, 102 S.Ct. 580, 70 L.Ed.2d 483 (1981); *United States v. McFadyen-Snider,* 552 F.2d 1178, 1183 (6th Cir.1977); *United States v. Largent,* 545 F.2d 1039, 1043 (6th Cir.1976), *cert. denied,* 429 U.S. 1098, 97 S.Ct. 1117, 51 L.Ed.2d 546 (1977); *United States v. Ring,* 513 F.2d 1001, 1004 (6th Cir.1975). Before admitting prior acts evidence, the district court must determine that the evidence is admissible for a proper purpose and that the probative value of the evidence outweighs its potential prejudicial effects. *See, e.g., United States v. Dabish,* 708 F.2d 240, 242 (6th Cir.1983); *United States v. Vincent,* 681 F.2d 462, 465 (6th Cir.1982). The district court has broad discretion in balancing probative value against potential prejudicial impact. *Dabish,* 708 F.2d at 242; *Vincent,* 681 F.2d at 465. Furthermore, the prior acts generally must be relevant to a matter at issue and must be substantially similar to, and near in time to, the offense charged in the indictment. *See, e.g., United States v. Hamilton,* 684 F.2d 380, 384 (6th Cir.), *cert. denied,* 459 U.S. 976, 103 S.Ct. 312, 74 L.Ed.2d 291 (1982); *McFayden-Snider,* 552 F.2d at 1183; *Largent,* 545 F.2d at 1043.

*Id.,* at 1258–59.

We believe that the testimony concerning prior drug deals between Passarella and Parsons, and Passarella and Hudson, was properly admissible even though not charged in the indictment. This evidence was not offered for an improper purpose, such as to show criminal propensity; rather, the government offered this evidence for the "legitimate purpose of showing the background and development of the conspiracy...." *United States v. Magnano,* 543 F.2d 431, 435 (2d Cir.1976). Rule 404(b) of the Federal Rules of Evidence

---

6. These deals apparently took place sometime in 1979. The conspiracy charges relating to the counterfeiting violations under counts one through three charge that the conspiracy began

"on or about the third week of February, 1980." Count four charges that the conspiracy to distribute the Schedule II controlled substances took place "on or before February, 1980."

further supports our conclusion. That rule provides that while evidence of other crimes is not admissible in order to show criminal propensity, it may be admissible for other purposes, "such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." In our view, testimony concerning prior drug transactions between Passarella and Parsons, and Passarella and Hudson, was admissible under Rule 404(b) for the legitimate purpose of proving the "existence of a larger continuing plan, scheme or conspiracy, of which the present crime on trial is a part." McCormick, *Evidence*, § 190 (2d Ed.1972); *see also* 2 J. Weinstein and M. Berger, *Weinstein's Evidence*, ¶ 404[16] (1985). This evidence showed that there was an ongoing plan or scheme involving Passarella and others to engage in crimes which were the subject of the indictment. This evidence was therefore relevant to both the existence and the continuing nature of the conspiracy.

We also note that the prior drug transactions, which were the subject of the challenged testimony, were "similar to, and sufficiently near in time to, the offenses charged in the indictment." *Ismail*, 756 F.2d at 1259. Thus, Parsons testified that in the beginning of 1979, both he and Hudson negotiated drug deals with Passarella involving marijuana, cocaine, heroin, and dilaudids. Count four of the indictment states that "on or before the second week of February, 1980 ..." Passarella and Hudson engaged in drug deals involving, *inter alia*, dilaudid and morphine. This count also states that Passarella engaged in drug deals with Hugh White during this period involving dilaudid, morphine and cocaine. Both of these acts were alleged to be in furtherance of the conspiracy to distribute Schedule II controlled substances. The testimony concerning Passarella's prior drug transactions was plainly similar to, and near in time to, the offenses charged in the indictment.

We must also reject Passarella's argument that this testimony was more prejudicial than probative. Undoubtedly, the evidence was prejudicial. So is all evidence of one's commission of a crime. The real question is whether this evidence was "unfairly" prejudicial and whether such unfair prejudice substantially outweighed the probative value of the evidence. Fed.R.Evid. 403. *See, e.g., United States v. Dabish*, 708 F.2d 240, 242 (6th Cir.1983). In addition, "[i]t is well settled that a trial judge's discretion in balancing the probative value of evidence against its potential for unfair prejudice is very broad." *Dabish*, 708 F.2d at 243. In the present case, we are unable to conclude that the trial court judge abused his discretion in admitting the testimony concerning the contraband seized from Hudson's U-Haul trailer, the crimes committed by others, or Passarella's prior drug transactions. Passarella has simply failed to demonstrate how this evidence was unfairly prejudicial. He is not entitled to launder the evidence of his participation and thereby distort the true nature of his role.

Passarella's other claims of error are without merit. Our review of the complicated facts of the conspiracy as spelled out in the record fully satisfies us that there was sufficient evidence to support Passarella's convictions on each of the five charged offenses. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Accordingly, the judgment of the district court is AFFIRMED.